TRINA A. HIGGINS, United States Attorney (#7349)
ALLISON H. BEHRENS, Assistant United States Attorney (#38482MO)
BRENT L. ANDRUS, Assistant United States Attorney (#NY5143474)
LUISA GOUGH, Assistant United States Attorney (#17221)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:22-cr-481-DBB |
| Plaintiff, | UNITED STATES' CONSPIRACY (*JAMES*) PROFFER |
| vs. | Judge David B. Barlow |
| APRIL GREN BAWDEN, CHAD AUSTIN BAWDEN, PHILLIP GANNUSCIA, DUSTIN GARR, ROBERT MCKINLEY, RICHARD SCOTT NEMROW, and JESSICA BJARNSON, | Chief Magistrate Judge Dustin B. Pead |
| Defendants. | |

The United States of America, by and through the undersigned Assistant United

States Attorneys, hereby submits its Conspiracy Proffer (Proffer) in response to

Defendants' Motions for *James* Hearing.[1] This Proffer begins by briefly discussing caselaw governing the admissibility of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E) and, alternatively, other provisions of Rule 801. Next, the Proffer outlines the scope and contours of the conspiracy with references to some of the evidence the United States intends to use, before describing how the evidence establishes the necessary elements for admission.

The government is not detailing all its evidence showing the existence of a conspiracy, nor is it describing every statement made in furtherance of the charged conspiracy. The Proffer does not list all the witnesses or evidence. It is not intended to be a full recitation of the government's evidence and witnesses for trial, or a means of committing to present certain evidence and witnesses. Rather, this Proffer highlights the evidence sufficient for the Court to admit the coconspirator statements. In this manner, the government will establish that (1) a conspiracy existed, (2) Defendants were part of the conspiracy, and (3) the statements the government seeks to admit were made in furtherance of the conspiracy and are therefore admissible as nonhearsay.

---

[1] *See United States v. James,* 590 F.2d 575 (5th Cir. 1979) (requiring a pretrial determination on the admissibility of coconspirator statements under Federal Rule of Evidence 801(d)(2)(E)). Reviewing the docket, it appears there are six outstanding *James* Motions: ECF 257 (Chad Bawden), ECF 330 (Robert McKinley), ECF 337 (Dustin Garr), ECF 340 (Phillip Gannuscia), ECF 345 & 346 (Richard Scott Nemrow), ECF 348 (Jessica Bjarnson). The substance of the parties' arguments comes from Mr. Bawden's filing (ECF 257), which the other parties incorporated into their Motions.

## RELEVANT PROCEDURAL HISTORY

A federal grand jury sitting in the District of Utah returned an Indictment against nine defendants on December 7, 2022. (ECF 1 *Sealed Indictment*.) A Superseding Indictment was returned on March 29, 2023—adding a tenth defendant—and all defendants were arraigned on the Superseding Indictment on April 26, 2023. (ECF 176, *Superseding Indictment*; ECF 208, 209 *Minute Entries*.) The Superseding Indictment brings, among other things, three conspiracy charges: Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349); Conspiracy to Commit Bank Fraud (18 U.S.C. § 1349); and Conspiracy to Commit Money Laundering (18 U.S.C. § 1956(h)). (ECF 176 *Superseding Indictment*.)

Due in part to voluminous discovery, the complexity of the case, and the number of Defendants, trial was repeatedly continued to allow Defendants adequate time for review and to file pretrial motions. (ECF 170 *Order Excluding Time Under the Speedy Trial Act*, dated Feb. 10, 2023; ECF 221 *Order Excluding Time Under the Speedy Trial Act,* dated Apr. 26, 2023; ECF 336 *Order Excluding Time Under the Speedy Trial Act*, dated Oct. 17, 2023, ECF 402 *Order Excluding Time Under the Speedy Trial Act*, dated Mar. 25, 2024.) Three defendants (Brent Knudson, Makaio Lyman Crisler, and Barbara Jo Jackson) have pled guilty pursuant to plea deals with the United States. (ECF 223 Change of Plea Minute Entry: Brent Knudson, dated Aug. 9, 2023; ECF 251 Change of Plea Minute

Entry: Barbara Jo Jackson, dated Aug. 18, 2023; ECF 379 Change of Plea Minute Entry: Makaio Lyman Crisler, dated Feb. 13, 2024.)

Meanwhile, two defendants filed Motions for a *James* Hearing, which various defendants joined. (ECF 257 *Motion for James Hearing* [Chad Bawden], dated Aug. 24, 2023; ECF 262 *Motion to Compel the Government to Define the Alleged Conspiracy* [April Bawden], dated Aug. 24, 2023; *see also supra* n.1.) The Court heard arguments on the *James* Motions in December 2023 and denied one in full and the other in part. (ECF 365 *Minute Order*: Motion Hearing, dated Dec. 18, 2023.) The surviving Motion was filed by Mr. Bawden (ECF 257), and joined by: Mr. McKinley (ECF 330), Mr. Garr (ECF 337), Mr. Gannuscia (ECF 340), Mr. Nemrow (ECF 345), and Ms. Bjarnson (ECF 348). The Court later scheduled trial for March 28, 2025, and after several amendments, set a deadline for the United States to file its *James* proffer on February 7, 2025. (ECF 419 *Trial Order*, dated May 24, 2024; ECF 430 *First Amended Trial Order*, dated Oct. 29, 2024; ECF 450 *Second Amended Trial Order*, dated Jan. 24, 2025.) This Proffer is intended to comply with the Court's oral ruling regarding the surviving *James* motion.

## LEGAL STANDARDS

Hearsay is an out of court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Although hearsay is not typically admissible at trial, the Federal Rules of Evidence provide several exclusions and exceptions from this general ban. *See id.* R. 802 ("Hearsay is not admissible unless any of the following provides

otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court."); *see also id*. R. 801 (outlining exclusions from hearsay); *id*. R. 803, 804, 807 (describing exceptions to the rule against hearsay). Nonhearsay statements are proper, admissible evidence, and include: [1] statements offered against an opposing party which were "made by the party in an individual or representative capacity," (Rule 801(d)(2)(A)); [2] statements "made by the party's agent or employee on a matter within the scope of that relationship and while it existed," (Rule 801(d)(2)(D)); and [3] statements "made by the party's coconspirator during and in furtherance of the conspiracy," (Rule 801(d)(2)(E)). Importantly, to qualify as hearsay, a statement must be offered "to prove the truth of the matter asserted in the statement." *Id*. R. 801(c)(2). If a statement "is not offered for its truth, the statement is not considered 'hearsay.'" *United States v. Brinson*, 772 F.3d 1314, 1322 (10th Cir. 2014).

To admit a coconspirator's out-of-court statements under Rule 801(d)(2)(E), a "court must determine by a preponderance of the evidence that: (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy." *United States v. Alcorta*, 853 F.3d 1123, 1137 (10th Cir. 2017). The elements of a conspiracy, in turn, are: (a) an agreement to violate the law; (b) "the declarant knew the essential objectives of the conspiracy"; (c) the declarant knowingly and voluntarily participated; and (d) "the coconspirators were interdependent." *United States v.*

5

*Rutland*, 705 F.3d 1238, 1248 (10th Cir. 2013). "The existence of a conspiracy may be inferred from circumstantial evidence." *United States v. Martinez*, 825 F.2d 1451, 1452 (10th Cir. 1987).

When making a Rule 801(d)(2)(E) determination, it must be more likely than not that the foregoing is true. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987). Because this is a preliminary question about whether evidence is admissible, the rules of evidence, other than those governing privilege, are inapplicable. *Id.* at 177–78 (quoting Fed. R. Evid. 104). And "[t]he court may consider both independent evidence and the statements themselves" to make its findings. *Rutland*, 705 F.3d at 1248. Some independent evidence beyond the coconspirator statements is required to link the defendant to the conspiracy, but it "need not be substantial." *Alcorta*, 853 F.3d at 1142 (internal quotation and citation omitted).

Courts have discretion in making pretrial determinations on the admissibility of coconspirator evidence. *Roberts*, 14 F.3d at 514. In the Tenth Circuit, it is preferrable for the court to utilize a *James* hearing to satisfy the prerequisites for admission of a coconspirator statement. *Alcorta*, 853 F.3d at 1138. A court may, however, "provisionally admit the evidence with the caveat that the evidence" connects up at trial. *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995). The proper approach depends on "the particular configuration of the government's evidence and the constraints of a multi-defendant trial." *Roberts*, 14 F.3d at 514.

6

## FACTUAL PROFFER

*Background* [2]

Companies seeking to obtain customer payments through credit or debit cards must establish merchant accounts with sponsoring banks that are part of the credit card networks (*e.g.*, Visa, Mastercard, American Express, and Discover). To obtain merchant accounts, companies must submit merchant processing applications with key information about the company, such as its ownership and the nature of the business. The credit card networks require truthful information on these applications to protect purchasers and themselves from the financial risks inherent in the payment system, particularly risk of fraud. Fraud often shows up in the form of chargebacks—return payments to consumers for disputed charges usually resulting from unauthorized or fraudulent credit card purchases.

For a business to obtain the capability of accepting credit and debit card payments, they must obtain a merchant account from a financial institution and merchant processor. Accordingly, the processors and merchant banks review merchant processing applications and engage in underwriting before and after opening a merchant account. Underwriting is the process of evaluating a business's merchant application to determine if the bank and/or processor can safely accept payments for the business and ensure

---

[2] Prior to delving into the conspiracy, a brief explanation of the payment processing industry is provided to give context and aid in understanding the conspiracy.

transactions remain secure and valid. Underwriters may review a company's financial records, customer feedback, chargeback history, transaction volume, billing policies, and industry risk in deciding whether to issue and/or keep open a merchant account. Should a company present a high risk, such as through generating excessive chargebacks, merchant processors may limit the company's payment processing capacity, completely deny the company a merchant account (or in the case of payment processors, recommend the financial institution deny an account), or shut down the merchant account.

As relevant here, the sales of nutraceutical, CBD, or dietary supplement products present as high risk for merchant processors. These industries are associated with large numbers of chargebacks, often due to false marketing and deceptive sales practices.

*Scope/Contours of the Conspiracy*

From at least in or around January 2016 through around April 2022, Defendants and others sold nutraceutical, CBD, and dietary supplement products to consumers through websites and call centers, billing customers through credit or debit card payments. Unable to get merchant accounts by disclosing the true nature of their business, Defendants used fraud to circumvent the payment processing safeguards and generate more than $100,000,000 in credit or debit card transactions. The facts proffered below establish that Defendants' conspiracy utilized at least three separate but interrelated fraud schemes to obtain money through credit card payments:

1. Defendants and others submitted fraudulent merchant processing applications using LLCs set up with the names and personal information of third parties—

*i.e.,* straw signers—to receive merchant accounts for credit card processing on their own online sales. (ECF 176 *Superseding Indictment*, dated Mar. 29, 2023 at ¶¶ 27–32, 39–48.)

2. Defendants and others further created false online storefronts to deceive underwriters to obtain and retain merchant accounts. (*Id.* at ¶ 33, 39–48.)

3. Defendants and others conducted fake sales transactions to lower the chargeback rates and keep merchant accounts open. (*Id.* at ¶¶ 34–35.)

The proffered facts further establish Defendants engaged in a money laundering conspiracy to conceal and disguise the nature of the proceeds. (*Id.* ¶¶ 49–52, 57–58.)

As the proffered facts will show, the Defendants played different roles in the conspiracy.

- *Scott Nemrow*—Hidden owner and operator of the main nutraceutical company. He was involved in the operation from at least 2013 until its demise. He was aware of the three fraud schemes and oversaw nearly all parts.
- *Phil Gannuscia*—Was an early partner of Nemrow's who helped with the set up of the fake LLCs with straw signers. He knew about the false online storefronts.
- *April and Chad Bawden*—Ran the customer service center together. They knew about the fake LLCs with straw signers, and the false storefronts. They were involved in the operation from about 2019 to around April 2022.
- *Robert McKinley*— An early mentor to Nemrow in the business. Owned the nutraceutical fulfillment company for a time and was responsible for directing sales traffic. Mr. McKinley knew about and encouraged all three fraud schemes. He worked as a type of consultant, connecting the players in the scheme and coordinating the fraud from a distance. He received a portion of every sale. He was involved in the operation from at least 2013 until around April 2022.
- *Dustin Garr*—Owned the nutraceutical company before selling it to Nemrow and others. He and the employees he controlled ran the IT operations for the conspiracy and were responsible for product fulfillment. He was directly involved in setting up the false storefronts and running the fake sales transactions. He was involved in the conspiracy from at least 2013 until around April 2022.

9

- *Jessica Bjarnson*—Worked as an accountant for the nutraceutical company. She was aware of operations and assisted in the call center operations. She was involved in the conspiracy from around 2019 until April 2022.

The anticipated evidence will show:

1. Mr. Nemrow and Mr. Gannuscia were partners whose business ventures focused on sales. (Nemrow MOI dated Oct. 24, 2024.[3]) Starting around 2013, they focused on selling nutraceutical products online. (*Id.*) They knew merchant processing was crucial to the success of their business. (*Id.*)

2. Mr. Crisler was their employee in charge of operations. (Crisler MOI dated Aug. 24, 2023.) He managed bank accounts, paid employees and company expenses, and handled day-to-day tasks for Mr. Nemrow and Mr. Gannuscia. (*Id.*; Nemrow MOI dated Oct. 24, 2024.)

3. Ms. Bjarnson worked as an accountant for and managed the operations of the finances. (Knudsen MOI dated Jan. 5, 2023.)

4. Mr. Garr and Mr. McKinley were also business partners involved with nutraceutical sales. (Crisler MOI dated Aug. 24, 2023; Nemrow MOI dated Oct. 24, 2024.) They had a fulfillment business, providing nutraceutical products to Mr. Nemrow and Mr. Gannuscia. (Nemrow MOI dated Oct. 24, 2024.) Mr. Garr sourced the nutraceutical products, and oversaw an information technology company that created web pages and managed a customer relationship management software program (CRM) built to manage sales. (Nemrow MOI dated Oct. 24, 2024; Crisler MOI dated Aug. 24, 2023.) Mr. McKinley worked as a web traffic broker, connecting Mr. Nemrow and Mr. Gannuscia with people who would drive customers to their websites. (Crisler MOI dated Aug. 24, 2023.)

5. Mr. Garr and Mr. McKinley approached Mr. Nemrow and Mr. Gannuscia about starting a business together. Mr. Garr offered to continue doing software and provide product. Mr. McKinley would bring customer leads. Both Mr. Garr and Mr. McKinley knew about merchant processing and offered help with that. (Nemrow MOI dated Oct. 8, 2024.)

---

[3] Each of the individuals whose interview information is relied upon below is expected to testify to these facts at trial.

6. In about 2016, Mr. Garr and Mr. McKinley sold their order fulfillment company to Mr. Nemrow and Mr. Crisler for $1.5 million. (Crisler MOI dated Aug. 24, 2023; Nemrow MOI dated Oct. 24, 2024.) The company became Target Fulfillment LLC. (*Id*.)

7. Although Mr. Garr and Mr. McKinley sold the fulfillment company, they continued to be heavily involved in the business. (Crisler MOI dated Aug. 24, 2023; Nemrow MOI dated Oct. 24, 2024.) They still provided product to Mr. Nemrow and Mr. Gannuscia. (Crisler MOI dated Aug. 24, 2023; Nemrow MOI dated Oct. 24, 2024.) Mr. Garr remained responsible for maintaining the CRM and web pages. (Crisler MOI dated Aug. 24, 2023; Nemrow MOI dated Oct. 24, 2024.) Mr. McKinley continued to work as a web traffic broker. (Crisler MOI dated Aug. 24, 2023; Nemrow MOI dated Oct. 24, 2024.)

8. Through their continued involvement, Mr. Garr and Mr. McKinley benefited off the Target Fulfillment's sales. As the product source, they made anywhere from $1–$3 for each nutraceutical bottle sold. (Crisler MOI dated Aug. 24, 2024; Nemrow MOI dated Oct. 24, 2024.) They charged a fee for funding products. (Crisler MOI dated Aug. 24, 2023.) Mr. McKinley made an additional $3 per sale for brokering the web traffic. (*Id*.) Mr. Garr received payment for maintaining the CRM and providing IT services. (*Id*.) They made a lot of money this way. (*Id*.)

9. There were two key components Mr. Nemrow and Mr. Gannuscia needed for their business to succeed: credit card processing capability, and web traffic to draw in buying customers. (Crisler MOI dated Dec. 6, 2023, Nemrow MOI dated Oct. 8, 2024.)

10. To process credit cards at a volume that would generate profit, they needed hundreds of merchant accounts. (*Id*.) And they did this through creating sham LLCs. (Knudsen MOI dated Jan. 5, 2023.)

11. Mr. Garr and Mr. McKinley taught Mr. Nemrow how to obtain multiple merchant accounts using different LLCs. (Nemrow MOI dated Oct. 8, 2024.) And Mr. McKinley told Mr. Nemrow about how to use other peoples' information for creating these LLCs to move more volume. (*Id*.)

12. Sham LLCs were fake businesses formed by "straw signers." (*Id*.) In other words, individuals recruited to list their name and information as the business owner on paper only, but having no actual ownership of the LLC. (*Id*.) The straw signers

were paid a small sum of money in return for allowing their information to be used on the sham LLC documentation. (Crisler MOI dated Aug. 24, 2023.)

13. Mr. Knudsen and other employees of Mr. Nemrow and Mr. Gannuscia—including Ms. Jackson, Ms. Bawden, and Mr. Bawden—would recruit straw signers and submit merchant processing applications for a sham LLCs formed by the straw signer. (*Id.*; Knudson MOI dated Jan. 5, 2023; Prop. Exh. 278 Sham LLC App.) Ms. Jackson, Ms. Bawden, and Mr. Bawden were paid a set fee for each straw signer they recruited. (Knudson MOI dated Aug. 24, 2023.)

14. The phone numbers and email addresses on the merchant applications for the sham LLCs were not associated with the straw signers and they did not have access to them. (Knudson MOI dated Jan. 5, 2023.) The documentation submitted to the banks and processors contained forged, copied, or pasted signatures inserted by Mr. Knudson and other employees of Mr. Nemrow and Mr. Gannuscia. (*Id.*)

15. In reality, the sham LLCs were controlled by Mr. Nemrow, Mr. Gannuscia, and their employees to run customers' credit card payments through the sham LLCs' merchant accounts. (*Id.*; Crisler MOI dated Aug. 24, 2023.)

16. Mr. Nemrow, Mr. Gannuscia, Mr. Crisler, Mr. Bawden, and Ms. Bawden knew the documentation for the merchant applications contained forged and pasted signatures.  (*Id.*) *All* Defendants knew merchant applications necessary for the scheme were submitted using sham LLCs associated with straw signers. (Knudson MOI dated Aug. 9, 2023.)

17. For each merchant application, at the direction of Mr. Lyman and often Mr. Garr, Mr. Garr's IT employees would create two websites for the sham LLC—a landing/sales page and a bank page. (Bill Hudson Anticipated Testimony; *see also* Knudson MOI dated Jan. 5, 2023; Crisler MOI dated Aug. 24, 2023.) The two web pages ran different ad campaigns, which was key to the success of the business. (Bill Hudson Anticipated Testimony.)

18. The bank pages had several different design elements intended to persuade underwriters to issue merchant accounts to the sham LLCS. (Bill Hudson Anticipated Testimony.) First, they were less deceptive than the landing/sales pages. (*Id.*) Second, they did not process customer sales, yet were made to appear as if they did. (Bill Hudson Anticipated Testimony; Knudson MOI dated Jan. 5,

2023; *see also* Proposed Exh. 8, email re: Skin Sites.) The bank pages were only provided to the banks. (Bill Hudson Anticipated Testimony.) The main purpose in these different pages was to ensure underwriters would grant the sham LLCs a merchant account so they could process more credit card transactions. (*Id.*)

19. The bank pages served a second purpose as well. Because only the banks had access to them, it was clear when a purchase came from an underwriter doing due diligence. (*Id.*) If an order came through a bank page, Mr. Garr, Mr. Lyman, and Mr. Nemrow's employees would put a different label on the product. (*Id.*)

20. *All* Defendants knew fake bank pages were made to obtain merchant accounts so they could increase the volume of credit card transactions and ultimately boost profits. (Crisler MOI dated Aug. 24, 2023; Nemrow MOI dated Oct. 8, 2024 and Oct. 24, 2024; Bill Hudson Anticipated Testimony.)

21. The ad campaigns on the landing/sales pages were designed to deceive customers by not explaining that they were actually agreeing to a subscription and that their card would be charged monthly. (Crisler MOI dated Dec. 6, 2023; Bill Hudson Anticipated Testimony.) The subscription sales, or "rebills" as they were called, were important to generate profit. (*Id.*)

22. Mr. McKinley controlled what ads would run and what would be sold online. (Nemrow MOI dated Oct. 24, 2024.) Mr. McKinley directed Mr. Nemrow and Mr. Crisler on the ads to run on the landing pages. (Crisler MOI dated Aug. 24, 2024; Nemrow MOI dated Oct. 24, 2024.) Mr. Garr and his employees created the landing pages. (Crisler MOI dated Aug. 24, 2024; Nemrow MOI dated Oct. 24, 2024.) There was only one landing/sales page for each product and those were sent to marketers, who would drive traffic. (*Id.*)

23. After submitting the merchant processing applications and bank page for a sham LLC for underwriting, if the sham LLC passed, it would be given a merchant ID number (MID). (Bill Hudson Anticipated Testimony.) Due to the nature of the business, selling nutraceuticals, the MIDs assigned to the sham LLCs had limited credit card processing capacity and they would be shut down if they had too many chargebacks. (*Id.*)

24. Generally, CRMs track and manage sales. The CRM created by Mr. Garr and his employees had several elements specifically designed to facilitate the conspiracy. (*Id.*)

25. For one, the CRM tracked whether sales came through the bank pages or the landing pages. (*Id.*) This enabled Mr. Garr's employees to label the bank products differently. (*Id.*)

26. Additionally, Mr. Garr's CRM was constructed to distribute sales across the MIDs. (*Id.*) When a sham LLC was given a merchant ID number, it would then be assigned to a specific product/ad campaign in the CRM. (*Id.*) As sales came in from the landing page assigned to that product, they would be distributed among all the MIDs assigned to that product/ad campaign. (*Id.*) Rebills on product subscriptions were also distributed among the MIDs. (*Id.*; Prop. Exh. 23–25 emails regarding rebills.) This equal distribution was called "load balancing." (Knudson MOI dated Jan. 5, 2024.)

27. Load balancing was necessary to balance the number of chargebacks caused by the deceptive advertising and sale tactics on the landing pages. (*Id.*; Bill Hudson Anticipated Testimony; Crisler MOI dated Aug. 24, 2023.) Customers would frequently complain and request refunds for their purchases, claiming the advertising was deceptive. (Bill Hudson Anticipated Testimony; Knudson MOI dated Jan. 5, 2023.)

28. All Defendants closely watched the ratio between chargebacks and successful transactions, or "chargeback rate," because if the percentage got too high the bank would shut down the MID assigned to a sham LLC. (Knudson MOI dated Jan. 5, 2023; Crisler MOI dated Aug. 24, 2023; Nemrow MOI dated Oct. 24, 2024; Bill Hudson Anticipated Testimony; *see* Jackson MOI dated Dec. 21, 2022.) If that happened, the sham LLC could no longer process credit card sales, thereby limiting the volume of sales that could be processed through the landing page. (Nemrow MOI dated Oct. 24, 2024; Bill Hudson Anticipated Testimony; Crisler MOI dated Aug. 24, 2024.)

29. *All* Defendants knew the sales pages ran deceptive ads, in part because of the customer complaints, the high chargeback rates, and how frequently MIDs were shut down. (Crisler MOI dated Aug. 24, 2023; Nemrow MOI dated Oct. 8, 2024 and Oct. 24, 2024; Bill Hudson Anticipated Testimony; Knudson MOI dated Jan. 5, 2024, Gregory Cox Anticipated Testimony.)

30. Defendants took two steps to combat high chargeback rates and keep the sham LLC MIDs operating.

14

31. First, Mr. Gannuscia and Mr. Nemrow hired Ms. Bawden and Mr. Bawden to create and manage a customer service call center. (Nemrow MOI dated Oct. 24, 2024; Bill Hudson Anticipated Testimony; Crisler MOI dated Aug. 24, 2023.) The call center employees would welcome new customers, make additional sales, and pre-emptively address problems to prevent chargebacks. (Bill Hudson Anticipated Testimony.) Over time, Mr. Bawden and Ms. Bawden expanded the role of the call center to include recruiting straw signers and setting up sham LLCs to obtain MIDs. (Crisler MOI dated Aug. 24, 2023.)

32. Second, Mr. Nemrow, Mr. Garr, and Mr. McKinley, through their employees, would run fake sales transactions through the MIDs to increase the number of successful transactions and lower the chargeback rate. (Nemrow MOI dated Oct. 24, 2024; Bill Hudson Anticipated Testimony; Crisler MOI dated Aug. 24, 2023.) These fake sales transactions were called "friendlies" and were made using prepurchased gift cards. (Nemrow MOI dated Oct. 24, 2024; *see also* Proposed Exhs. 5, 7, 11, 12 emails regarding gift card transactions.) Mr. Garr and Mr. McKinley initially handled the friendlies. (*Id.*)

33. Mr. Garr adapted the CRM to run "friendlies" automatically through the MIDs assigned to the sham LLCs. (Bill Hudson Anticipated Testimony; Crisler MOI dated Aug. 24, 2023.) Mr. McKinley and others would track the chargeback rates for the different sham LLC MIDs. (Nemrow MOI dated Oct. 24, 2024.) When they would get too high, Mr. McKinley along with Mr. Nemrow, would direct Mr. Garr and his employees to run friendlies on the sham LLC MIDs. (Crisler MOI dated Aug. 24, 2023; Bill Hudson Anticipated Testimony.)

34. The goal in all these deceptions—[1] the sham LLCs formed with straw signers but controlled by Defendants, [2] the bank pages created to trick banks into issuing MIDs to the sham LLCs, [3] the friendlies used to lower the chargeback rates and hide the true sales returns—was to get money through deceiving customers. Defendants took in millions processing credit cards through the sham LLCs and then moved the money from the sham LLC bank accounts (which they controlled) to other accounts they owned. (Crisler MOI dated Aug. 24, 2023.)

## ANALYSIS

Based on the foregoing Proffer, the court should conditionally admit the

coconspirator statements for trial. The government's evidence shows it is more likely than not that (1) a conspiracy existed, (2) the coconspirator declarants and the Defendants were members of the conspiracy, and (3) the coconspirator statements were made in furtherance of the conspiracy.

**1. A conspiracy existed.**

As noted, a conspiracy is established by demonstrating (a) there was an agreement to violate the law, (b) the coconspirator declarants knew the objectives of the conspiracy, (c) the coconspirator declarants knowingly and voluntarily participated in the conspiracy, and (d) the coconspirators were interdependent. Circumstantial evidence may be used to create an inference that a conspiracy exists. Here, there is sufficient evidence to establish the existence of a conspiracy.

a.   <u>Defendants agreed to violate the law.</u>

There need not be an express or formal agreement to establish a conspiracy; just evidence showing "the coconspirators tacitly came to a mutual understanding."[4] Direct and circumstantial evidence show Defendants agreed to violate the law.

All Defendants knew the goal of the business was to increase profits through large volume sales. And all Defendants knew large volume sales required significant merchant processing capacity. With tacit understanding, they worked together in three fraudulent schemes to enhance their processing capacity and increase profits. Their open

---

[4] *Rutland*, 705 F.3d at 1250 (internal quotation marks and citation omitted).

cooperation on the fraud shows an agreement to violate the law.

For the first fraud scheme, an employee testified that all Defendants knew they were creating sham LLCs by submitting forms to the bank using others' personal information. Mr. McKinley and Mr. Garr taught Mr. Nemrow how to set up merchant accounts by creating multiple LLCs. And Mr. McKinley talked to Mr. Nemrow about using others' information to create sham LLCs. Then, Mr. Nemrow and Mr. Gannuscia had their employees, including coconspirators Mr. Bawden and Ms. Bawden, recruit straw signers and submit forged applications to obtain MIDs for the sham LLCs. In sum, everyone knew the merchant applications were full of lies and no one voiced any disagreement with what was occurring. In fact, it was the opposite: they all worked in concert to effectuate the fraud. This shows tacit agreement.

Similarly, on the second fraud, Mr. Nemrow and Mr. Gannuscia would have their employees provide the names and information on the sham LLCs to Mr. Garr and his employees to create a fake bank page. Mr. Garr's employee designed the bank pages to look different from the sales pages. And while there were many, many sham LLCs with their own bank pages to pass underwriting, there was only one sales page per product and multiple LLCs would be tied to a sales page. Mr. McKinley controlled the ads that would run on the sales pages and only directed customer traffic to the sales pages, not the bank pages. Mr. Garr designed the CRM to run purchase from the bank pages and the sales pages different.

17

Finally, the friendlies were orchestrated through many defendants. Mr. Garr and Mr. McKinley initially handled the friendlies. Eventually, Mr. Garr programmed the CRM to run friendlies and distribute the fake transactions among the sham LLCs' MIDs. The Bawdens kept track of the chargeback rates, as did Mr. McKinley and Mr. Nemrow. This information was used to determine how many friendlies a MID from a sham LLC needed.

The facts show the Defendants agreed to engage in fraud to increase profits. They all knew there was fraud, and they all contributed to it for more money. And all Defendants made money through the fraud. Mr. Garr, Mr. Nemrow, and Mr. Gannuscia and Mr. McKinley made money off each credit card sale; more merchant IDs meant more sales. Mr. Garr and his employees made money off creating bank pages and running friendlies. The Bawdens made money finding straw signers and successfully obtaining MIDs for the sham LLCs. Mr. Garr, Mr. Nemrow, and Mr. McKinley promoted the conspiracy by incentivizing their employees to engage in fraud. This shows understanding and ultimately agreement to engage in unlawful activity—namely, fraud.

Altogether, the direct and circumstantial evidence shows the Defendants agreed to violate the law.

b.  The declarants of the coconspirator statements knew the objective of the conspiracy was to make money.

To prove knowledge of the essential objectives merely requires demonstrating

"the defendant shared a common purpose or design with his alleged coconspirators," not that the alleged codefendants "knew all the details or all the members of the conspiracy."[5] The essential objective of the conspiracy was to make money. There was one way to achieve this: increased capacity to run credit cards for more sales. Increased capacity required numerous merchant IDs. The evidence demonstrates that the coconspirator declarants knew and shared this goal.

The coconspirator declarants the United States will rely upon are mostly cooperating Defendants and employees of the Defendants. The testimony, as partially laid out above, indicates these individuals were quite knowledgeable about what was needed to increase sales and the money coming in. They all talk about how crucial it was for the business to be able to process credit cards. And they knew the only way to do this was through MIDs. Every step of the way, these coconspirator declarants show they knew what the goal was.

Mr. Nemrow worked on the conspiracy from top to bottom to make sure there were MIDs to process sales—hiring people to set up sham LLCs with straw signers, tracking chargeback rates on MIDs to prevent the LLCs from being shut down, explaining about how friendlies kept chargeback rates down to keep the sales going.

Mr. Hudson worked for Mr. Garr and Mr. Nemrow and was intimately involved in getting orders out, especially special orders for banks coming through on the separate

---

[5] *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006) (internal quotations marks omitted).

bank pages. He knew these needed to be different to keep the MIDs active for increased sales.

Mr. Crisler ran the operations with Mr. Nemrow and communicated to Mr. Garr and his employees the information about new MIDs, running friendlies, and taking direction from Mr. McKinley on the ad campaigns to run on the sales pages. He knew that MIDs were key to obtaining credit card sales and ultimately profiting from the venture.

Ms. Jackson recruited straw signers and paid them so she could create sham LLCs. She submitted paperwork with forged signatures. She reviewed mail for the LLCs to look at information on chargebacks and forwarded that on so others could prevent them. Her job was on the ground floor to get MIDs for more credit card transactions.

Finally, Mr. Knudson took direction for Mr. Nemrow, Mr. Garr, and Mr. Crisler. He helped set up straw signers and forged merchant applications for the straw LLCs. He submitted bank page information with the merchant applications to trick underwriters. This was clearly to establish MIDs for running credit card transactions to obtain a profit.

The evidence strongly shows the coconspirator declarants—Mr. Nemrow, Mr. Crisler, Mr. Knudson, Ms. Jackson, and Mr. Hudson—shared a common goal, which was to make money by filing fraudulent claims for COVID-related tax credits.

c.  <u>Mr. Nemrow, Mr. Crisler, Mr. Knudson, Ms. Jackson, and Mr. Hudson also knowingly and voluntarily participated in the conspiracy.</u>

All the coconspirator declarants were active participants.

Mr. Nemrow directly told law enforcement of his participation in the conspiracy and his efforts to help increase processing ability through gaining MIDs. He told law enforcement he thought this was his dream business. He was making money and felt like he won the lottery.

Mr. Crisler likewise told law enforcement how his income increased by 500%. He purchased Target Fulfillment in his name, with Mr. Nemrow as a shadow partner, because Mr. Nemrow couldn't.

Mr. Kndson was also an active and willing participant in the conspiracy. He told law enforcement how—without the signers' knowledge—he forged signatures onto documents because he was lazy and straw signers wouldn't want to sign. This shows a clear willingness to engage in the conspiracy. He further generated phone numbers for the applications. He responded to emails intended for the sham LLCs. All on his own instigation.

Ms. Jackson was equally knowing and voluntary, although she testified she engaged in the conspiracy because she trusted the honesty and integrity of her coconspirators. She directed straw signers in many respects—instructing them to open bank accounts and give over the login information, telling them to keep mail related to chargebacks, forwarded docusign requests to Mr. Crisler or Mr. Knudson. She did all this of her own accord, although sometimes at the behest and direction of her superious. Yet

never did she testify she was forced to do so.

Finally, Mr. Hudson testified that he took the job because he needed money. He had a family to feed and had bounced around from job to job. He testified that he was making good money but, in seeing the money made, he engaged in additional fraud of his own.

All these coconspirators had significant involvement in the conspiracy and demonstrated through testimony their knowledge of the conspiracy and their willingness to engage.

    d.  <u>The coconspirators were interdependent.</u>

Interdependence is present if the coconspirators were united in a common goal or purpose, that is, if their actions benefited each other or the success of the venture. *Rutland*, 705 F.3d at 1250. This was a massive conspiracy with many moving parts. Each of the coconspirators played a unique role and contributed in different ways to increase the number of MIDs, thereby increasing credit card sales and their bottom line. As owners, operators and employers within the conspiracy, any money made was a direct benefit to them. Because they profited from more credit card sales, pushing employees to obtain more MIDs and keep them active (by reducing chargebacks) necessarily worked in their favor. As outlined above, all the codefendants did that through unique roles that helped eachother effectuate the conspiracy. All were crucial to the success of the program, and their bottom line.

**2. The Defendants were members of the conspiracy.**

"A person is a member of a conspiracy if he was aware of the common purpose, willingly participated in the conspiracy, and intended to advance the purpose of the conspiracy." *Id.* at 1251. As laid out above, the common purpose of this conspiracy was to increase profits through boosting credit card sales. When Mr. Garr and Mr. McKinley approached Mr. Gannuscia and Mr. Nemrow, they asked them to handle merchanting because it is key to boosting credit card sales. The actions of all the coconspirators demonstrate they knew this was the purpose. Each spent considerable time trying to obtain MIDs through straw signers and fake bank pages, while also preventing MIDs from getting shut down using friendlies. Moreover, they willingly participated because they wanted a payout. Finally, their actions benefitted the conspiracy by directly increasing profits for themselves.

**3. The proffered statements were made in furtherance of the conspiracy.**

"A statement is in made in furtherance of a conspiracy when it is intended to promote the conspiratorial objectives." *Id.* at 1252. In the Tenth Circuit, the following sorts of statements are found to be in furtherance of a conspiracy:

> (1) statements explaining events of importance to the conspiracy; (2) statements between coconspirators which provide reassurance, which serve to maintain trust and cohesiveness among them, or which inform each other of the current status of the conspiracy; (3) statements identifying a fellow coconspirator; and (4) discussions of future intent that set transactions to the conspiracy in motion or that maintain the flow of information among conspiracy members.

*Id.* (internal citations and quotations omitted).

The United States anticipates introducing the following categories of coconspirator statements:

1. Emails between coconspirators and their employees.
2. Statements of coconspirators to their employees and other coconspirators.
3. Statements of coconspirators to straw signers.
4. Conversations between coconspirators.
5. Text messages between coconspirators.

These categories of evidence clearly involve statements by a member of the conspiracy in furtherance of the conspiracy. The statements will be reflected in emails, texts, and testimony of oral conversations. Work emails are clearly in furtherance of the conspiracy, as are communications with straw signers. The coconspirator conversations and text messages discuss straw signers, bank pages, and friendlies—all statements intended to promote the conspiratorial objections.

Altogether, the factual proffer meets the threshold burden to establish a conspiracy and the evidence should be admitted as nonhearsay, coconspirator statement.[6]

DATED this 7th day of February, 2025.

Respectfully Submitted,

TRINA A. HIGGINS
United States Attorney

---

[6] The United States reserves the right to present other theories of admissibility, which are that some statements are not hearsay at all, because they reflect verbal acts, do not reflect assertions of fact, and are not being submitted for truth of the matter asserted.

/s/ *Brent L. Andrus*
Brent L. Andrus
Assistant United States Attorney